## CARTER OIL CO. v. PACIFIC-WYOMING OIL CO., ET AL.*
(No. 1403; January 31, 1928; 263 Pac. 960)

MINES AND MINERALS—MINERAL LEASES—LEASE BONUS—FEDERAL LEASING ACT—APPEAL AND ERROR—EVIDENCE—UNCONTRADICTED TESTIMONY ACCEPTED AS TRUE ON APPEAL—GEOLOGIC STRUCTURES.

1. Finding that additional bonus agreed to be given by oil company when it was "actually vested with right to develop and operate * * * lands for oil and gas mining purposes, for a period as long as oil and gas shall be found in paying quantities," was earned, *held* proper under evidence, where company received from homesteaders under Leasing Act, §§ 13, 14, 17, 20 (30 USCA §§ 221, 223, 226, 229), right to secure lease for 20 years, with preference right of renewal under reasonable terms and conditions, notwithstanding contention that language of contract required that royalty should be same throughout the entire producing life of the property.

2. Additional bonus to be given under contract when oil company was vested with right to develop and operate lands ''for a period as long as oil and gas shall be found in paying quantities'' was not limited to contingency of company's securing lease from homesteaders for entire period, by fact that 5 per cent. royalty was payable under contract in event that company should become vested with right to develop and operate oil lands.

3. In suit against oil company to recover additional bonus which contract permitted when company became vested with right to develop certain lands, limitation of area to which company's right extended, under Leasing Act, § 27 (30 USCA § 184), prior to amendment thereof in 1926, providing no person should hold more than one lease within the geological structure of the same producing field, *held* not avoided by fact that homesteaders with whom oil company dealt could have consolidated their interests and jointly applied for a lease, under section 20 (30 USCA § 229), where contracts with homesteaders did not so provide and assignment to oil company was not made within time required.

4. Limitation to single person of one lease within geological structure of same producing oil and gas field, under Leasing Act, § 27 (30 USCA § 184), *held* not avoided, so as to permit development by corporation of increased acreage and recovery of additional bonus based on such acreage, by indirect holding by company of lands through homesteaders, where contracts with homesteaders provided for holding lands in trust for exclusive use, benefit, and profit of company, since under such contracts oil company was real party in interest.

5. Fact that the Secretary of the Interior had not determined whether certain government oil lands were in same geological structure, within terms of Leasing Act, § 27 (30 USCA § 184), limiting leaseholdings in single producing field, *held* not to prevent determination of question in suit to recover additional bonus based on right of oil company as assignee of homesteaders to develop and operate tract of land under leases or operating agreements.

6. Where all of testimony on particular issue is introduced on one side and remains uncontradicted, such testimony must be accepted as true on appeal.

7. In suit for recovery of bonus based on extent of area which oil company had right to develop, Supreme Court could not consider map, certified by register and receiver, offered to show lands which company had right to operate under contracts was not within same geologic structure, under Leasing Act, § 27 (30 USCA § 184), limiting holdings under leases of government oil lands on account of court's inability to tell what further facts defendant might have shown if map had been admitted in evidence below.

8. Definition by the Secretary of the Interior of producing and geologic structure would not be conclusive of determination as to whether government lands operated by company under several leases or operating agreements for oil and gas were within single geologic structure, subject to limitation of holdings, in Leasing Act, § 27 (30 USCA § 184), in view of effect of sections 13, 14, 17 (30 USCA §§ 221, 223, 226), under which new producing wells create new producing geologic structures, to which limitation of section 27 becomes applicable.

*See Headnotes: (1) 17 C. J. p. 498 n. 8; 40 C. J. p. 889 n. 86. (2) 40 C. J. p. 889 n. 86. (3) 40 C. J. p. 889 n. 86. (4) 40 C. J. p. 889 n. 86. (5, 6) 4 C. J. p. 777 n. 61; 40 C. J. p. 889 n. 86. (7, 8) 4 C. J. p. 679 n. 43; 40 C. J. p. 889 n. 86.

ERROR to District Court, Natrona County; BRYANT S. CROMER, Judge.

Action by the Pacific-Wyoming Oil Company and another against the Carter Oil Company. Judgment for plaintiffs and defendant brings error.

*Hagens & Murane* and *James Veasey*, for plaintiff in error.

The lease covered the producing life of the property; parol evidence may be offered to show the meaning of a trade term, Myers v. Walker, 24 Ill. 134; Willmering v. McGaughey, 30 Ia. 205; Mitchell v. Henry, 15 Ch. Div.

181; Dana v. Fiedler, 12 N. Y. 40; Hatch v. Douglas, 48
Conn. 116; Berry v. Kowlasky, 95 Calif. 134; Barton v.
McElway, 22 N. J. L. 165; Brown v. Brooks, 25 Pa. St.
210; Daniel v. Papas, (Okla.) 220 Pac. 335; Electric Co.
v. Steel Co., (Pa.) 120 Atl. 116. The doctrine applies even
where the words are without ambiguity. An oil and gas
lease for a fixed term does not meet the exigencies of the
business; they must continue during the producing life of
the property whether it be long or short; this is an estab-
lished custom in the production of petroleum; it is settled
law in every jurisdiction that under a lease of the custo-
mary type, if the lessee is not producing in paying quanti-
ties at the expiration of the definite term, the lease expires,
otherwise the lease continues during production, Eaton
v. Gas Co., 122 N. Y. 416; Shellar v. Shivers, 171 Pa. St.
569; Young v. Co., 194 Pa. St. 243; Eastern Co. v. Coule-
han, 65 W. Va. 531; Ashgrove Co. v. Brick Co., 100 Kans.
547; Roach v. Co., 75 Okla. 220; Poe v. Ulrey, 233 Ill. 56;
Gas Co. v. Beales, 166 Ind. 684. ''Paying quantities''
means sufficient production to pay the operating costs of
the property plus some small profit, Cassell v. Crothers,
193 Pa. St. 329; Oil Co. v. Snodgrass, 71 W. Va. 438;
Dickey v. Co., 69 Kans. 106; Pelham Co. v. North, (Okla.)
188 Pac. 1069; as applied to a well, the cost of drilling,
equipping and operating must be taken into account,
Osborn v. Finkelstein, (Ind.) 126 N. E. 11; Ohio Co. v.
Shilling, 127 N. E. 873; Hart v. Co., 84 So. 169. Custom
and usage in a particular business presupposes dealings
with respect thereto, 17 C. J. 460; Shores v. Stitt, 78 N. W.
563; Maurin v. Lyon, 69 Minn. 257; Hatch v. Douglas, 48
Conn. 116; Carter v. Co., 77 Pa. St. 286; Electric Co. v.
Steel Co., supra. The Federal Leasing Act, 41 Stat. 437,
authorizes homestead entrymen, upon application, to re-
ceive a lease under the same conditions applying to per-
mits issued under Section 13 of the Act; no one is allowed

more than one lease within the geologic structure for the same producing oil and gas field.

*F. Chatterton* and *F. A. Williams,* for defendants in error.

The cause was first decided on defendants' demurrer to the petition (see 226 Pac. 193 and 228 Pac. 284); the agreement in controversy involves lease rights upon surface homestead entries as defined by the Federal Leasing Act; the testimony of appellant's witnesses relates to leases on fee lands and valid placer lands and not to the public domain; the right to operate as long as oil and gas shall be found in paying quantities was given homesteaders by Sections 7 and 20 of the Leasing Act, 226 Pac. 196; an express written contract, embodying in clear and positive terms the intention of the parties, cannot be varied by evidence of usage or custom, Barnard v. Kellogg, 10 Wall. 383; Grace v. Ins. Co., 109 U. S. 278 (27 L. Ed. 932). Appellant's third defense that the homesteads were within the geologic structure of the same oil and gas producing field, was not supported by evidence; withdrawal was proven, but not classification; the admission of incompetent evidence in a non-jury trial is not reversible if there be other evidence to support the decree, irrespective of inconsistent rulings, Freeman v. Peterson, 45 Colo. 102; Brown v. Bank, 49 Colo. 393. The assigned errors relating to a federal question were not urged. The point is one for federal courts to decide, based on adverse decisions in the State Supreme Court, Browne v. R. R. Co., 267 U. S. 255.

*Hagens & Murane* and *James Veasey,* in reply.

Inquiry into the technical meaning of the phrase "for a period as long as oil and gas shall be found in paying quantities" is foreclosed by the former decision of this court in its ruling on appellant's demurrer; so far as appellant's obligation to pay the additional bonus was concerned, it is conditioned upon the homesteaders being

vested with the particular title provided for in paragraph 3 of the homesteaders' contract; appellant's contention that they would have gained an opportunity for oil and gas rights for 160 acres only, thus reducing respondents' right of recovery to the sum of $5200.00, is not sustainable.

*F. Chatterton* and *F. A. Williams*, in reply.

Appellant's contentions were disposed of in the former decisions, 31 Wyo. 314 (226 Pac. 193 and 228 Pac. 284).

BLUME, Chief Justice.

This is the second appeal in an action brought by Pacific-Wyoming Oil Company and Glenn Jordan, as plaintiffs, against the Carter Oil Company, defendant. The first appeal was from an order, and judgment thereon, sustaining a demurrer to plaintiffs' petition. This court reversed the judgment and sent the case back for a new trial, holding that the petition stated a cause of action. 31 Wyo. 314, 226 Pac. 193; 31 Wyo. 452, 228 Pac. 284. The trial resulted in a judgment for plaintiffs in the sum of $44,961.35, from which the Carter Oil Company has appealed. The parties will be designated herein either by name or as in the court below. For a proper understanding of this opinion, it will be necessary to refer to the salient facts, although some of them also appear in the former opinions.

During the year 1917 three citizens of Wyoming, Marks, Marshall and Van Treak, each made an agricultural homestead entry on 320 acres of land in Niobrara County, Wyoming, under the laws of the United States. The oil and gas deposits underlying the land were not at that time, but were subsequently, reserved to the United States. The plaintiff Jordan, and McCall and Crow, obtained contracts from these homesteaders, giving them the right to develop these lands for oil and gas, should the homesteaders, by subsequent legislation of Congress, be vested with that privilege. Thereafter and on March 12, 1919, said

McCall, Jordan and Crow, as parties of the first part, entered into a written contract with the Carter Oil Company, as party of the second part, which contract is attached to the petition as exhibit "D," in which McCall, Jordan and Crow agreed to secure the cancellation of the three contracts with the homesteaders above mentioned, and in lieu thereof secure oil and gas contracts executed by the three homesteaders direct to the Carter Oil Company. The latter agreed to determine, immediately after such contracts were obtained, whether or not there were any valid placer petroleum claims upon the lands prior in right to the filing of said homesteaders, and if not, then upon the delivery to it of such contracts, executed by the homesteaders, to pay to first parties, McCall, Jordan and Crow, a cash bonus of $7.50 per acre, covering all of said land. The defendant made such examination and satisfied itself that there were no prior petroleum claims against said lands. New contracts with the homesteaders were duly executed, as required by exhibit "D," and delivered to defendant about March 20, 1919, and the cash bonus of $7.50 per acre was duly paid to parties of the first part. The contracts with the homesteaders, executed direct to the defendant, are attached to the petition as exhibits "E," "F," and "G." The Pacific-Wyoming Oil Company is the assignee of the rights of McCall and Crow.

The contract of March 12, 1919, above mentioned, attached as exhibit "D" to the petition, provides in part, in section three thereof, as follows:

"If, under said contracts procured from said homesteaders as aforesaid, the second party obtains a valid right to develop and operate said lands, or if the second party, under appropriate legislation, has an opportunity to obtain such right to develop and operate said lands or a part thereof for oil and gas mining purposes, then the second party shall pay the first party an additional bonus of $32.50 per acre when it is vested with a valid right to develop said lands for oil and gas mining purposes, or when,

by appropriate legislation of Congress, it has an opportunity to secure said right. The intention and meaning of this paragraph being that the first parties are entitled to such additional bonus upon one of two contingencies: (a) when the second party is actually vested with the right to develop and operate said lands for oil and gas mining purposes, for a period as long as oil and gas shall be found in paying quantities; (b) or when the second party, under appropriate legislation, has an opportunity to secure such right. Provided such additional bonus shall be paid upon such acreage only as it actually acquires such right or the opportunity to secure such right. Should the second party be vested with the right to develop and operate said lands for oil and gas mining purposes as aforesaid, then to the extent of the lands covered thereby and upon the vesting of such right, the second party shall pay the first party a royalty of five per cent for all oil produced from said lands, in addition to the 2½ per cent royalty payable to the particular homesteaders, and in addition also to the royalty payable to the United States.''

The important parts of contracts ''E,'' ''F,'' and ''G,'' all of which are alike, are sections 3 and 4 thereof, the substance of which is set forth in our former opinion (31 Wyo. 455), the first of these sections providing that if the homesteaders, under congressional legislation, should acquire an absolute title to the oil and gas in the land in question, the defendant should be given a lease thereon for ten years ''and as long thereafter as oil or gas should be produced therefrom in paying quantities;'' the second of these sections providing, in substance, that if the homesteaders, under proper congressional legislation, should become vested with the right to obtain a permit, lease or other contract, granting them the right to develop and operate the lands in question, or a part thereof, for oil and gas mining purposes, they should, upon demand, make proper application therefor and do all necessary things in the premises, and to assign any permit, lease or contract

so obtained. A portion of the latter section will be more fully mentioned hereafter.

The legislation of Congress referred to in the foregoing contracts, was legislation providing for leasing oil and gas lands on the public domain. Bills to that effect were pending in Congress; one had passed the Senate of the United States, another had passed the House of Representatives, but a disagreement existed between the two houses on various provisions to be embodied in the intended law, and none of the pending bills had become a law at the time that the contract between the parties hereto was entered into. The two houses of Congress finally agreed on the so-called Leasing Act, which was signed and became a law on February 25, 1920 (41 Statutes at Large, 437-451). Section 13 of the act provides for prospecting permits for lands not within a producing structure, to be granted by the Secretary of the Interior; section 20 of the act provides for a preference right to such permit in favor of homesteaders; section 14 provides for the issuance of leases, if discovery is made under a prospecting permit; sections 16 and 17 of the act provide for a lease in favor of the permittee who makes a discovery, such lease to be issued for a period of twenty years, with the preference right in the lessee to renew the same for successive periods of ten years, upon reasonable terms and conditions to be prescribed by the Secretary of the Interior. In the former appeal, the case, as already stated, was before us on a demurrer to the petition. It was conceded by counsel for the defendant that the Leasing Act conferred upon the defendant the opportunity for some sort of a right to develop the lands in question for oil or gas, but it was contended that this right was not coextensive with the right contracted for, in that a lease for the period of twenty years with preference right of renewal, as stated in the Leasing Act, was not a lease "for as long as oil or gas in paying quantities might be found in the land." We

held in the former opinions in this case that the petition herein stated a cause of action; that under the allegations thereof, if true, and under the foregoing provisions of the Leasing Act, the defendant herein had the opportunity to acquire the right for which it contracted, under its contract of March 12, 1919, and that the petition in the case disclosed that the contingency had arisen under which at least a part of the additional bonus of $32.50 per acre was payable; in other words, that the opportunity of defendant to secure a lease for the period of twenty years with a right of renewal for successive periods, under reasonable terms and conditions, was, so far as disclosed by the petition, the equivalent of a lease "for a period as long as gas and oil shall be found in paying quantities." We held, however, that the facts, under which the contract was entered into, might show a different situation. After the case was sent back for a new trial, the defendant answered, alleging, in brief, that the phrase "right to develop and operate lands for oil and gas as long as oil or gas shall be found in paying quantities," has, and on March 12, 1919 had, by custom, a technical and peculiar meaning in the oil business, and that the same is and was at the time understood and employed in that business to mean a right to develop and operate for oil and gas for as long as oil and gas should be found in paying quantities, and for a royalty which would be the same throughout the entire producing life of the property in question; and that the foregoing phrase was used by the parties to the contract in suit in this sense. Plaintiffs filed a general denial to these allegations. The ultimate point attempted to be shown by this defense was the same as that involved in the former appeal, namely, that the right which defendant had an opportunity to obtain under the Leasing Act is not coextensive with the right contracted for by defendant and mentioned in the contract in suit. Defendant, to

sustain this defense, introduced considerable testimony, the general character of which will be stated later.

1. The rule upon which counsel for the defendant rely is, that if in reference to the subject matter of a contract, particular words and expressions have, by custom, acquired a technical meaning, different from their plain, ordinary and popular meaning, the parties using these words or expressions in such a contract must be taken to have used them in their peculiar and technical sense. 17 C. J. 498, 499. We do not think that the evidence in this case establishes the application of this rule herein. We need not take much time in discussing the mere point of the life of the lease disassociated from the terms and conditions thereof. If the defendants had the opportunity to acquire a lease on the lands in question for twenty years with the preference right of renewal for successive terms upon the same terms and conditions as the original lease, the renewals would be substantially automatic, and at the option of the holder, and such lease should, we think, be considered the equivalent of the lease mentioned in the contract in suit. No evidence could well change that conclusion; and if it could, we do not think that it has been done by the evidence in this case. The only point which we need to consider in this connection, and which is of any importance at all in any view of the case, is whether or not the evidence establishes that a lease on land ''for as long as oil and gas is found in paying quantities,'' implies, under the custom in the oil business, and was used by the parties to mean, that the terms and conditions of such lease should be the same throughout the time that oil or gas in paying quantities might be found in the land. Some witnesses testified to the technical meaning alleged in defendant's answer. Most of the witnesses, however, simply testified that it is, and has for many years been, customary to take leases with substantially the

phraseology quoted.   The substance of the testimony of the witnesses may be stated in the language of Mr. Veasy:

"The customary form of oil leases in March, 1918, and years prior (and subsequent) thereto, was one extending as long as oil and gas should be found, with fixed royalty throughout the term."

And in the light of the evidence as a whole, we think that the witnesses who attempted to testify to a technical meaning of such leases, meant simply what Mr. Veasy stated in his words just quoted.

The testimony related mainly to privately owned lands, and it appears that even in such cases the rule has not been altogether uniform, but that in some cases, which were said to be exceptional, a change in the amount of the royalty to be paid has been provided for during the life of the lease, though the change in such cases has been by way of reduction of such royalty.   It was further shown that when oil leases were first issued for Indian lands in Oklahoma and in Montana, they were for a limited term, but that for several years prior to 1919, they were made to conform to leases on privately owned lands.   In Wyoming, as we know, leases on state lands have always been issued for the period of five years, with a right of renewal in favor of the lessee.   Leases in this state on privately owned lands, however, or on placer claims, were shown to have been regularly issued in accordance with the custom in other parts of the country.

The surrounding circumstances shown by the evidence in this case do not indicate that the contract in question was entered into by the parties herein with the understanding that the leases mentioned in the contract in suit should be in conformity with the custom above mentioned. Nor does the evidence require a holding that when such custom was shown, it was binding upon the parties hereto, or that it controls the construction of the contract in suit.

That custom relates mainly to lands owned or controlled by private individuals. It has not at all been uniform, as shown above, in connection with leases issued by the Government of the United States on lands under its direct control. Further, the contract in suit was entered into in this state, which, on its lands, issues leases only for a limited term, with right of renewal, and so far as the evidence indicates, the plaintiffs at least, or their predecessors in interest, may have entered into the contract in suit with such Wyoming leases in mind. Aside from that, the parties dealt with each other in the light of the pending bills in Congress, and at least the bill approved by one of the houses of Congress—a fact well known to the agents of defendant—expressly disapproved of the custom prevailing as to leases for privately owned lands. Further, the contracts in question here, including the contract in suit, as well as the contracts with the homesteaders, clearly show the doubt which the parties entertained as to what ultimate legislation would result from the bills then pending in Congress, for alternative provisions in favor of defendant were made in each of them, depending upon the character of the ultimate action of Congress.

This conclusion as to the effect of the foregoing evidence leaves the case, so far as the point now under consideration is concerned, in substantially the situation as it was before us on the former appeal, and we shall not repeat what we said then. We have not, however, overlooked the argument of counsel for defendant that, while under the contract in suit, the five per cent royalty payable to plaintiff was payable whenever defendant should acquire any sort of lease, the additional bonus, on the other hand, should not be payable except under the contingency that defendant should secure a lease "for as long as gas and oil should be found in the land." We think it clear that counsel are in error. The royalty of five per cent was payable in the event that defendant should be "vested

with the right to develop and operate said lands for oil and gas mining purposes *as aforesaid.*" The "as aforesaid" clearly refers to the right previously mentioned in the contract, namely, to the right to a lease for a period as long as oil and gas in paying quantities should be found in the land. If, accordingly, the contention of defendant were right, plaintiffs would not, in view of the ultimate congressional legislation, have been entitled to anything more than the bonus of $7.50 per acre, no matter how valuable the oil and gas rights in the lands might have been found to be—a construction altogether inconsistent with the evidence that leases in the neighborhood of the lands in question were exceedingly valuable at the time the contract in question was entered into. We might further add, that the contract in suit was drawn by eminent counsel for defendant, and whatever doubt there might be on the point under discussion, could not, accordingly, be resolved in its favor. We conclude, therefore, that the judgment of the trial court on the question now under discussion was right, and is affirmed in so far as holding the defendant liable to pay the extra bonus for at least one lease, since, though the case must be reversed on another point, it would be useless, we think, to relitigate the point now under discussion.

2. The important question herein, which was not before us on the former appeal, is the amount of recovery, for, according to the contract between the parties, the bonus of $32.50 per acre was to be paid only on such portion of the land embraced within the contracts with the homesteaders which defendant should have the opportunity to lease for oil and gas mining purposes, as above stated. Section 27 of the Leasing Act, above mentioned, prior to the amendment thereof in 1926—this amendment not applying in the case at bar—provided in part as follows:

"No person, association or corporation, shall take or hold at one time more than three oil or gas leases granted hereunder in any one state, and not more than one lease within the geological structure of the same producing oil or gas field; * * * and no person or corporation shall take or hold any interest or interests as a member of an association or associations, * * * holding a lease under the provisions hereof, which, together with the area embraced in any direct holding of a lease under this act, or which, together with any other interest or interests as a member of an association or associations, * * * holding a lease under the provisions hereof, for any kind of mineral leased hereunder, exceeds in the aggregate an amount equivalent to the maximum number of acres of the respective kinds of minerals allowed to any one lessee under this act. Any interests held in violation of this act shall be forfeited to the United States by appropriate proceedings instituted by the attorney general for that purpose."

The defendant pleaded as a third defense in substance that all of the lands in controversy are upon the same producing geologic oil and gas structure, and it contends that it had no opportunity of acquiring more than one lease, embracing 160 acres of land, and that it, accordingly, is not liable, in any event, in excess of $5200 and interest. Counsel for the plaintiffs give three reasons why the contention should not be upheld. We shall consider these separately.

(a) They contend that if the limitations in the statute above mentioned have any application, the homesteaders and their assigns could consolidate their interests and jointly apply for a lease which might embrace 2560 acres. They cite the provisions of section 20 of the Leasing Act, which provides in part as follows:

"In the case of lands bona fide entered as agricultural and not withdrawn or classified as mineral at the time of entry, but not including lands claimed under any railroad grant, the entrymen or patentee, or assigns, where assign-

ment was made prior to January 1, 1918, if the entry had been patented with the mineral right reserved, shall be entitled to a preference right to a permit and to a lease, as herein provided, in case of discovery; *and within an area not greater than a township such entryman, and patentees or assigns holding restricted patents may combine their holdings, not to exceed 2560 acres, for the purpose of making joint application.*"

Counsel for plaintiffs rely upon that portion of the section which is italicized by us. They have, however, failed to point out where that has any application here, and they have contented themselves with a bare statement of their point. Now defendant could not have made application for permits as assignees of the homesteaders for two reasons, (a) because the contracts in question do not so provide, and (b) because no assignees are permitted to make such application under section 20, supra, unless the assignment was made prior to January 1, 1918. The law seems to contemplate only assignees of patentees, and all preference right is lost under an assignment made after the date mentioned. 48 L. D. 214. Hence, only the homesteaders were permitted to make the application. But the contracts with them do not provide, as already stated, that they may be required to make a joint application; there is no provision by which the defendant could compel them to do so, and we certainly cannot, in the absence of such contract, presume that they would do so.

(b) Counsel for plaintiffs further claim that section 27 above cited relates only to direct interests—that is to say, if we understand their contention, to cases in which the leases are held in the name of a particular party; that the section does not prohibit indirect holdings, at least up to 2560 acres; that the statute, or the rules made pursuant thereto, do not prevent a locator on the public lands from obtaining financial aid in the development of his claims; that if parties can be found ready, able and willing

to finance him, they are at liberty to do so under suitable contracts to that effect, without acquiring the status of permittees or lessees; that, in other words, operating agreements may be made between parties without violating the section of the statute just mentioned. They further claim that such operating agreement has been provided for in the contracts between the defendant and the homesteaders, and that, accordingly, the defendant had the opportunity to get leases on all of the lands, embracing 960 acres, mentioned in these contracts. They rely on the provisions of section 4 thereof, which in the first portion provides for application by the homesteaders for permits and for an assignment of the permits to the defendant, in case of proper congressional legislation, and then proceeds to make an arrangement, as counsel claim, for an operating agreement in the following words:

"Provided further that should there be no provision in such law for the assignment herein provided for, then the first parties or the one entitled to make such permit, lease or other instrument, shall hold the title created thereby in trust for the exclusive use, benefit and profit of the second party, subject only to the royalty of the United States thereunder, and subject also to said additional royalty of $7\frac{1}{2}$ per cent, payable to the first parties, and in that event, the said party agrees to advance to the first parties such funds as are necessary to develop said lands, the proceeds of such operations to be applied as follows: (a) To the royalty due the United States. (b) To the royalty due first parties. (c) To the expense of development and operation. (d) The remaining proceeds to be and remain the property of the second party. The second party agrees to pay all expenses connected with the securing of such permit, lease or other instrument, as provided in this paragraph."

Counsel for plaintiffs, to sustain their contention that the foregoing provision constitutes an operating agreement permissible under the law, have cited us to an opin-

ion of Mr. Finney, First Assistant Secretary of the Interior, dated October 9, 1924, reported in 50 L. D. 652. In that case seven permits were issued, six of them embracing 2560 acres, and one of them 1320 acres. It was proposed to issue to a developing corporation, as consideration for drilling on the land, a one-sixth interest in six of these permits. This arrangement was held to be lawful, and it was pointed out that while a corporation can hold directly —that is to say, in its name—only one permit and only one lease on the same geologic structure, it may have indirect holdings thereon to the extent of 2560 acres. The decision would, at first blush, seem to give color to the claim of counsel for plaintiffs, but it must be borne in mind that the arrangement proposed in the foregoing case gave the developing corporation no control of the property, but only a comparatively small interest—one-sixth— while the arrangement in the case at bar above pointed out gave the defendant substantial control of the property. The Assistant Secretary above mentioned considered the latter situation in the case of Associated Oil Company, reported in 51 L. D. 241, and 51 L. D. 308. In the first of these opinions it was said:

"In this connection it may be said that an operating agreement might fall short of being an assignment in a technical sense, and yet confer upon the operator such an indirect interest as would affect the latter's qualification under section 27 of the act of February 25, 1920 (41 Stat. 437), as, for example, where it vests in the operator the control of operations under the permit or lease."

In the second of these opinions it was said:

"An opinion, M. 13831 (unreported), dated October 14, 1924, referred to in the letter, pointed out that direct holdings were those in which there was a direct contractual relation with the United States either through direct grant of a prospecting permit or lease, or subrogation to permit-

tee or lessee status, through an approved assignment. Indirect interests were defined as those derived through ownership in corporations or membership in associations. In that letter it was stated, as a general proposition, that operating agreements were not *direct holdings,* but constituted the operator an associate of the permittee or lessee.

"In my opinion of October 21, 1925 (51 L. D. 241), to which your client also referred, it was pointed out that an operating agreement which gave the operator anything more than compensation for services rendered as employee or agent of a permittee or lessee constituted an interest or holding under the act of February 26, 1920. It was further pointed out that in order that there be an association composed of permittee or lessee and drilling contractor or operator, a *bona fide* joint venture must be shown, and it was suggested that an operating agreement which made the operator the real party in interest as to a permit or lease, with the permittee or lessee, merely holding a reserved royalty, would be construed as an assignment, despite its form. While this letter did not so state, it follows that if the effect of the arrangement was in fact to transfer the obligation of the lease or permit, and control thereunder, to the operator, so as to amount to an assignment thereof, the Government would be obligated to treat the interest as such and regard it as a *direct* holding."

We are constrained to agree with these opinions; we think that the real party in interest under the so-called operating agreement created by the contracts with the homesteaders would be the defendant, and that the agreement, if carried out, would be in violation of the intent of section 27 aforesaid, if the land is located on the same geologic structure. In fact, we are unable to see how the quoted provisions from the contract with the homesteaders could be construed to be anything else than as a pure attempt of an evasion of the law, without, however, in the least meaning to intimate that such was the intention of the parties at the time the contract was drawn; but we simply construe that contract in the light of the law as it was actually passed.

(c) Counsel for the plaintiffs further contend that no one but the Secretary of the Interior is authorized to say whether certain lands are on the same geologic structure within the meaning of section 27 aforesaid, and that until he has determined and fixed the boundaries thereof, the defense of the defendants cannot be maintained. We think, however—without determining what the effect of a definite determination of such boundaries by the Secretary of the Interior would be—that in the absence of such determination, the question of whether certain lands are on the same geologic structure must be determined by evidence the same as any other fact. We fail to see any possible reason for holding otherwise, and none has been pointed out. Now the record fails to show (except as mentioned below) that the Secretary of the Interior has determined the geologic structure with reference to the lands in question, and only the defendant introduced testimony as to the actual facts. That testimony is all to the effect that the lands of the homesteaders in this case are all on the same geologic structure with other lands, on part of which producing oil wells are located. If that is true, and we must accept it as true for the purposes of this decision, the defendant never had an opportunity to get more than one lease thereon. The only evidence on this point sought to be introduced by the plaintiffs, but which was excluded by the court, was a map, certified by the register and receiver at Douglas, showing that the land of the homesteaders is not a part of a producing geologic structure therein designated on the map in blue. The map further contains the following writing:

"Land colored blue is designated as being within a producing structure. Said land is also included in petroleum withdrawal No. 25. Letter N. 10-23-18.

Douglas, Wyoming, April 27, 1925.

We hereby certify that this is a true copy as shown by our records of all lands within a producing structure in

township 36 N. Rg. 64 W. included in petroleum withdrawal No. 25, letter N. Oct. 23, 1918.''

We cannot consider this map and the writing thereon in evidence, as we are requested to do, because, if for no other reason, we cannot tell what facts the defendant might have shown, if the court had admitted it in evidence. Further, we are not satisfied that if the Secretary of the Interior has actually defined a producing geologic structure as shown on the map, excluding the lands in question here, that this would be of controlling importance herein. The limitation of section 27 can be actually applied to a particular case only when the occasion therefor arises. If lands are within a producing geologic structure, leases may be issued in accordance with the provision of section 17 of the Leasing Act, under the limitation provided by section 27. Prospecting permits are not issued in such case, since discovery has already been made. 47 L. D. 582; 48 L. D. 213; 48 L. D. 355. If, on the other hand, lands are not already within a producing structure, a prospecting permit is first necessary pursuant to section 13 of the Leasing Act, and no lease can be issued until after it has been established ''to the satisfaction of the Secretary of the Interior that valuable deposits of oil or gas have been discovered within the limits of the land embraced'' within the permit. Sec. 14 of the Leasing Act. Now a discovery of valuable deposits of oil or gas on such land, at least if it is made by a ''producing well,'' would instantly create, in such case, a new producing geologic structure, necessarily at once making the limitation of section 27 applicable to that structure the same as on any other. So if such discovery were made on one or more of the homesteads in question in this case, but all three should appear to be on the same structure, thus shown to exist, the defendant in this case would necessarily be limited to one lease, and the point that the homesteads are not on a structure al-

ready producing at this time would become immaterial
and have no controlling effect. And it would hardly do
for plaintiffs to take the position that no oil or gas, and
therefore no other producing geologic structure, may ever
be found on the lands here in question, for if it were as-
sumed that there is no oil or gas within these lands, and
they are not within a producing structure, then, neces-
sarily, no lease could ever be issued therefor under the
Leasing Act, and hence defendant would never have the
opportunity mentioned in the contracts in controversy
here. Plaintiffs must, in order to recover at all, neces-
sarily proceed upon the theory, as they have heretofore
done, that if defendant had complied with its contracts, a
prospecting permit would have been issued, and a discov-
ery would have been made, entitling it to a lease or leases,
and that, not having complied with its contracts, it is not
in position to controvert these facts, aside from the pre-
sumption that has probably arisen from the withdrawal
of the lands in question as oil and gas lands by the duly
constituted authorities of the United States. Hence, it is
clear that if it should appear that the lands in question are
excluded from a producing geologic structure as already
defined by the Secretary of the Interior, and if that fact,
as contended, excludes proof that other lands are in fact
included therein, the defendant should, nevertheless, have
an opportunity to show that if it had complied with its
contracts and had drilled on the lands in question, the
three homesteads would have been found to be on the
same, though independent, geologic structure, preventing
it from either taking or holding more than one lease there-
on. The only point on which we have some doubt in this
connection is whether or not the discovery contemplated
by section 14, supra, and which must be assumed as above
mentioned, is a discovery that would create a "produc-
ing" structure, so as to bring the limitation in section 27
into operation. But it may be suggested that if it should

not be so treated, and the Department of the Interior should issue more than one lease to a party that had made discovery, or to his assignees, and the discovery should result in producing wells, and hence in the creation of a new producing geologic structure, the department might then find itself in the position of being a party to the holding, by a corporation, of more than one lease on the same producing geologic structure in violation of section 27, supra, for that section, so far as we can see now, makes no provision than in such case more than one lease may be held by the same person or corporation. This point has not been argued, and we do not, accordingly, decide it, and what we have said thereon must be treated as a suggestion only. See as to apparent attitude of the Department of the Interior, regulation 8 (a), 48 L. D. 152.

The judgment is accordingly reversed, except as already indicated, and the case is remanded for a new trial, limited, however, solely to the question of the amount of recovery by reason of the limitation contained in section 27 of the Leasing Act. As to whether, if the court should find that the defendant had the opportunity of acquiring only one lease, the acreage would be limited to 160 acres, as mentioned in section 14 of the Leasing Act, or whether the last clause of that section or that clause in the light of the regulations adopted, should be held to give it the opportunity of acquiring a lease for 320 acres, we do not determine, for the point has not been argued. If the pleadings already filed are not sufficiently definite, they may, on application, be amended.

*Affirmed in part and reversed in part.*

KIMBALL and RINER, JJ., concur.