80 Wyo. 389 (1959)
343 P.2d 508
345 P.2d 786
Matter of the ESTATE of Charles L. STRINGER, Charles Limuel Stringer, also known as Chas. L. Stringer, Deceased.
Bertie M. STRINGER, Appellant (Defendant below),
v.
Wilhemine M.L. MILLER, Appellee (Plaintiff below).
No. 2871.
Supreme Court of Wyoming
August 18, 1959.
November 3, 1959.
*392 Henry A. Burgess and Bruce P. Badley, Sheridan, for appellant.
G.R. McConnell and Walter Scott, Laramie, for appellee.
Before BLUME, C.J., and PARKER and HARNSBERGER, JJ.

OPINION.
Mr. Justice HARNSBERGER delivered the opinion of the court.
Following the death of Charles L. Stringer, deceased, his widow, Bertie M. Stringer, petitioned the court on December 4, 1957, for the appointment of an administrator of his estate alleging that he had died intestate. The following day, one Wilhemine M.L. Miller filed a petition containing two causes of action. In the first cause, an instrument dated December 8, 1952, was offered for probate and in the second cause, an instrument dated August 26, 1949, was offered, the petition praying that one or the other of these instruments be admitted to probate as the last will and testament of the deceased. Thereafter, on January 2, 1958, Bertie M. Stringer filed her petition for the probate of an instrument dated March 22, 1954.
*397 During the hearing that followed, the parties stipulated the 1952 instrument had been properly executed as a last will and testament of the deceased. As it was not available, a copy was received in evidence.
At the conclusion of the hearing which was held, and following submission of briefs by counsel, the court found that the petition of Wilhemine M.L. Miller, asking alternatively for the probate of either the 1949 instrument or the 1952 instrument, was contested by Bertie M. Stringer and that the petition of Bertie M. Stringer was contested by Wilhemine M.L. Miller. Inasmuch as Bertie M. Stringer had originally filed her petition that letters of administration be granted on the theory that the deceased had died intestate and later had filed another petition for the probate of the alleged will of 1954 of the deceased, we must assume from the court's findings that this meant Wilhemine M.L. Miller contested both of those petitions. The court also found generally in favor of petitioner Wilhemine M.L. Miller and against petitioner Bertie M. Stringer; that the 1954 instrument was a carbon copy; that the unsigned original of such instrument had not been signed by the deceased; that the subscribing witnesses did not see the deceased execute the carbon copy offered for probate; that the signature of the deceased appearing on the carbon copy was not proved; that there was no proof deceased had signed the 1954 carbon copy, either within or without the presence or hearing of the subscribing witnesses or at all; that the signatures on the 1949 and the 1954 instruments were not identical; that the proponent of the 1954 instrument had failed to meet the burden of proof that the document was the last will of the testator or was valid and in full force and effect; and that the court should deny the probate of the 1954 instrument.
*398 As to the 1949 instrument, the court found the deceased and his pre-deceased first wife, Emily K. Stringer, had executed identical wills except for the substitution of names where the context so required, and one of those wills was the 1949 instrument for which probate was sought; that there was a pre-will conference and contract to make such joint and mutual wills between the parties; that there had been established a contract to make the testamentary disposition in those 1949 wills; that the contract was supported by sufficient consideration in that the deceased Charles L. Stringer, the husband, promised to devise and bequeath property in which he and his wife had an equal interest, in a particular way, in consideration of a similar promise on the part of Emily K. Stringer, the wife, and that in reliance thereon each executed his and her separate will dated the 26th day of August, 1949; that Emily K. Stringer, the wife, died in December 1952, and her will executed in pursuance of the contract was thereafter probated by the deceased Charles L. Stringer, who accepted the benefits provided him under his wife's 1949 will.
The court then found there was a valid and existing contract between the deceased Charles L. Stringer and his first wife, Emily K. Stringer, deceased, to execute the joint and mutual wills of August 26, 1949.
The court further found there was insufficient evidence to establish the existence or validity of the December 8, 1952, will; that the August 26, 1949, will of the deceased, Charles L. Stringer, was duly and validly executed and in full force and effect on the date of his death, and that the subsequent marriage of the deceased to Bertie M. Stringer did not revoke the 1949 will nor was it revoked by any will or wills subsequently *399 made; that the 1949 will of the deceased should be admitted to probate and the costs should be assessed against Bertie M. Stringer.
Upon these findings the court adjudged and decreed that the petition for probate of the 1954 instrument be denied and that the petition for issuance to Bertie M. Stringer of letters of administration with the will annexed be denied; that the petition of Wilhemine M.L. Miller for letters of administration with the will annexed and for probate of the 1949 instrument be granted and that the 1949 instrument be admitted to probate as the last will and testament of the deceased; that the petition of Wilhemine M.L. Miller so far as it pertains to the 1952 instrument be denied and that the 1952 instrument be denied admission to probate; that there was a valid and existing contract between Charles L. Stringer, deceased, and Emily K. Stringer, deceased, for the execution of joint and mutual wills; that the deceased Emily K. Stringer had performed her part of that contract and that the deceased Charles L. Stringer had accepted the benefits of that contract by and through the probate of the estate of the deceased Emily K. Stringer; that the 1949 will of the deceased Charles L. Stringer which was being admitted to probate was the performance of the contract on the part of Charles L. Stringer, deceased, and the costs of the contest were assessed to Bertie M. Stringer.
From these findings and order and judgment of the court, Bertie M. Stringer appeals.
It may not be amiss to comment that, in strict propriety, the 1949 wills should not be referred to as joint wills, inasmuch as they were not contained in a single instrument. As is pointed out in 97 C.J.S. Wills § 1364, *400 e, pp. 286-287, "the terms `joint wills' and `mutual wills' are sometimes inaptly used interchangeably." There seems, however, to be no question but that the two wills executed in 1949 were mutual wills and were reciprocal in their provisions.
Appellant insists there was error in considering for probate at the same hearing all the instruments offered. Appellant contends that the court erred in receiving evidence regarding the 1949 and 1952 instruments at the same hearing had on the 1954 instrument. This, appellant says, is because the 1949 and 1952 instruments contained petitioner's affirmative allegations that there was an oral agreement to make the 1949 will and that the hearing upon the 1949 and 1952 instruments had been set immediately following that upon the 1954 instrument. Appellant also asserts that the court had expressly said the hearing was to be upon the 1954 instrument and indicates this meant the hearing would be only regarding that instrument, and that it was after both sides had rested that the court changed its mind and decided the hearing was upon all probate files relative to the estate of the deceased Charles L. Stringer.
Our examination of the record shows that all the court said at the commencement of the hearing was in answer to appellant's counsel's inquiry. "Do you want me to make an opening statement at this time?" To this the court replied, "Call your witnesses merely for the purpose of proving the due execution of the will." This statement falls short of expressly saying the hearing would be solely upon proof of the 1954 instrument. It merely advised counsel to proceed with the proof of his case.
*401 Appellant says this change afforded appellant no opportunity to object to evidence relating to the purported 1949 oral agreement to make a will and afforded appellant no opportunity to call witnesses, and, therefore, it constituted a denial of due process of law and gave appellant no opportunity to be heard. And appellant further contends it was error for the court to consider the issue of the oral agreement, at the time of hearing proof for the admission to probate of the 1954 instrument. Again we must disagree with appellant. An examination of the record shows that after the appellee-contestant had rested, the court stated that it desired to have briefs, and appellant's counsel then inquired if the three cases, which we understand referred to the probate of the 1949, 1952 and 1954 instruments, were consolidated for the hearing. To this the court replied in the affirmative. Appellant's counsel then attempted to obtain a stipulation from opposing counsel respecting the 1952 instrument, and when he did not succeed, requested the appellee to elect between the causes of action for probate of the 1949 or 1952 instruments. This resulted in appellant's counsel agreeing that by her pleading, appellant had admitted the validity of the execution of both the 1949 and the 1952 instruments. Thereupon, appellant's counsel requested the right to continue to call witnesses about the 1952 instrument, and then appellant's counsel, without any objection from either opposing counsel or the court, proceeded to and did call Bertie M. Stringer for further examination.
Under these circumstances, it is clear the appellant was not prejudiced by the consolidation of the hearing upon the several petitions for letters of administration or probating of instruments.
*402 We find nothing in Rule 42(a) of our Rules of Civil Procedure, which is referred to by appellant, to support her position that consolidation must be made before hearing. Of course, such a consolidation should not be had if it results in prejudice to any party litigant. We do not, however, find any such prejudice resulted in this instance.
In order to pass upon the correctness of the court's decision admitting the 1949 document as the last will and testament of the deceased, we must not only examine the evidence relating to the validity of the execution of the 1949 instrument, but we must ascertain whether the instrument subsisted as the last will and testament of the deceased at the date of his death. With respect to the first question, there seems to have been no dispute that the 1949 instrument was signed by the testator in the presence of the required number of witnesses and in that respect it was sufficiently authenticated. As to its subsisting as the last will and testament of the deceased as of the date of his death, the record seems clear that it did not. In the first place, the parties stipulated that the 1952 will of the deceased was validly executed and hence, as of the date of its execution, that instrument was the last will and testament of the deceased, and it contained a clause expressly saying:
"I, Charles Limuel Stringer, also known as Charles L. Stringer and C.L. Stringer, of Gillette, Wyoming, hereby make my last will, revoking all previous wills and codicils."
This express revocation in the 1952 will sufficiently fulfills our statutory requirement regarding revocation of wills as set forth in § 6-306, W.C.S. 1945, as follows:

*403 "No will or any part thereof shall be revoked unless by burning, tearing, cancelling or obliterating the same with the intention of revoking it, by the testator or by some person in his presence and by his direction, or by some other will or codicil in writing, signed, attested and subscribed in the manner provided by law for the execution of a will, excepting only that nothing contained in this section shall prevent the revocation implied by law from subsequent changes in the condition or circumstances of the testator. The power to make a will implies the power to revoke the same." (Emphasis supplied.)
The 1949 will of the deceased Charles L. Stringer, being thus expressly revoked by the later 1952 will, may not correctly be said to be the last will and testament of the deceased. Hence, the lower court was in error in admitting the 1949 will to probate as the last will and testament of the deceased. The court was not privileged to ignore the stipulation of the parties which established the 1952 instrument as the valid last will and testament of the testator as of the date of its execution.
However, notwithstanding the testator's 1949 will did not subsist as his last will at the date of his death, it still retained its character as evidence bearing upon the existence of a contract between the first wife, Emily K. Stringer, and the deceased.
There is no dispute between the parties that the wills of Emily K. Stringer and Charles L. Stringer executed in 1949 were identical except where the context required the substitution of different names. Each will, in the first instance, left all the property of the person making that will to the spouse, and then provided that in the event the spouse did not survive the *404 maker, that one-half of the property should go to the relatives of the deceased spouse. True, there is nothing said in either of these identical wills as to there being any contract or agreement between the parties for the making of the same. However, the court received testimony to the effect there was such an agreement and understanding, and in that connection the record shows the following in the testimony of Wilhemine M.L. Miller regarding statements of the deceased prior to making the 1949 will:
"Q. What did they discuss, Charles and Emily? A. Oh, making a Will, and they wanted to make a Will so that when they both passed on it would  what they had would be divided equally between their brothers and sisters, half and half on each side.
"Q. And did you hear both of them agree to that? A. Oh, yes, that was what they wanted in their Will.
"Q. And then what happened there, Mrs. Miller? A. Well, they took my dad out to the country with them, because he spent part of his time with us and part of his time with them during the summers, and the next time they came in they stopped at our house and said, `Well, we made our Wills.'
"Q. And how long after that was that? Do you recall? A. Well, it wasn't very long after that * * * I couldn't say exactly * * * but it was during that summer before they made their Wills.
"Q. Did they say anything further about what kind of Wills? A. Yes, they said they made that kind of Will as you have just explained, that they would give it to each other and, when both were dead, half went to the Kurllrusses [The Kurllrusses were the relatives of Emily K. Stringer] and half to the Stringers."
*405 The fact that this testimony referred to statements made by the deceased prior to the execution of the 1949 will does not legislate against its relevancy.
As is said in Van Houten v. Whitaker, Cal. App., 337 P.2d 900, 903:
"* * * a subsequently executed will may relate back to the making of any oral agreement which it embodies so as to validate the latter under the statute of frauds * * *."
Later on, the same witness testified that when Charles L. Stringer was considering marrying Bertie M. Stringer he said to the witness:
"`Mimm [Wilhemine], no matter what happens, what I do, everything will be the same between the Kurllrusses and me, and it will be just like Emily and I planned it.'" (Emphasis supplied.)
Ada Boyet, another witness, testified that deceased Charles L. Stringer told her in 1953 or 1954:
"Em's half was to go to the Kurlrusses and his half to the Stringers."
In recross-examination, Glenn Stringer testified:
"Well, they [The Stringers] said that they wanted it to be divided between the two families. * * * When they was both gone."
The record shows this statement was made in 1950.
In addition, there is no dispute but that Charles L. Stringer did receive the benefits and properties belonging to his first wife following her decease by virtue *406 of and in accordance with the provisions of her 1949 will which was identical with the 1949 will of the deceased in dispute here.
In Van Houten v. Whitaker, Cal. App., 337 P.2d 900, 903, supra, which action although not a parallel to the instant case, inasmuch as it was one in which it was sought to impose a trust upon a devisee who had received distribution of property under a joint will with her husband, nonetheless bears directly upon the question of the survivor's right to escape the obligation to carry out the contractual provision of such a joint will by revoking it. The court there approved what was said in Brown v. Superior Court, 34 Cal.2d 559, 564, 212 P.2d 878, 881:
"`Where two parties agreed to make mutual wills, each promising to dispose of his property to the other or, if the other be dead, to certain third persons, and one of the parties performs by leaving his property to the other, the intended devisees and legatees are entitled to enforce their rights as beneficiaries under the agreement. The contracting party who survives becomes estopped from making any other or different disposition of the property, and his obligations under the agreement becomes absolutely irrevocable and enforceable against him, at least where he avails himself of the provisions of decedent's will in his favor and accepts substantial benefits thereunder.'"
See also 97 C.J.S. Wills § 1366c, p. 298, and cited authorities. And to the same effect is 57 Am.Jur., Wills, § 174, p. 154.
In Schomp v. Brown, Or., 335 P.2d 847, 850, it is clearly stated:

*407 "* * * Such a reciprocal or mutual will, even though revoked, still stands as evidence of the contract. * * *"
As far as we have discovered, this court has not as yet considered the effect of mutual and reciprocal wills between married couples where the survivor has revoked after the death of the spouse and received benefits under the will of the deceased, but in Canada v. Ihmsen, 33 Wyo. 439, 456, 457, 240 P. 927, 932, 43 A.L.R. 1010, 1019, where such wills had been executed by unrelated persons, the court refused to accept the contention that such mutual and reciprocal wills created a contractual obligation because there was a lack of consideration. However, the court said:
"It may, however, be that certain arrangements of property, like that made among members of a family, should be put upon a somewhat different footing from those made between strangers in blood. In Lewis v. Lewis, 104 Kan. 269, 178 P. 421, the court says that such arrangements between husband and wife should be favored. That view is not dissimilar to the view adopted by the civil law. Alexander on Wills, § 70. Generally speaking, persons who made such contracts were, under the Roman law, considered as legacy hunters. Gaius, a noted jurist of the second century of our era, applied that term to persons who were given an undivided portion of an inheritance as well as to those who received a legacy, and held such gifts to be void. Digest, Justinian, 30, 64. Paul, another noted jurist, states that, when a man appoints another as his heir upon condition that such other should in turn appoint a third person as heir, such appointment is void. Digest, Justinian, 28, 5, 72. On the other hand, the famous Papinian wrote that the rule against the validity of reciprocal appointments does not apply where they are induced by mutual affection. Digest, Justinian, 28, 5, 71. * * *"
*408 While the testimony quoted above, evidencing the nature of the agreement between the first wife and Charles L. Stringer, is not voluminous, it is not contradicted and when considered in the light of the identical nature of the provisions of the wills of both parties concerned, it cannot be said to be unsubstantial evidence.
The lower court in the instant case quite possibly considered that in examining a testamentary document, it was entitled to do so with a view to discovering the dominant testamentary scheme, and if so, we are in agreement. In any event, it was the finding of the court that there was sufficient evidence to establish there was a contract between the deceased and his first wife, Emily, to make the testamentary dispositions which were contained in the 1949 wills. We are not disposed to disagree with that finding, although as previously indicated, we disagree with the lower court in finding that the 1949 document was the last will and testament of the deceased at the date of his death.
The appellee suggests that if we assume the will of 1952 had been revoked, the 1949 will of the deceased was revived, and quotes at length from diverse authorities  the sum total of which merely illustrates that there is a wide difference of opinion in different jurisdictions as to the reviving effect of the revocation of a subsequent will which is relied upon as having revoked a former will.
In the Annotation in 28 A.L.R. 911, it is said:
"There are five possible theories as to the effect, as a revival of a former will, of the destruction of a later will revoking the earlier, viz: (1) That the earlier will is revived as a matter of law; *409 (2) that the earlier will is revived unless an intention to the contrary appears; (3) that the earlier will is not revived; (4) that the earlier will is not revived unless an intention to revive it appears; and (5) that the question is one of intention without any presumption for or against revival."
In the Annotation's summary, it is pointed out that the view that the earlier will is revived ipso facto, is supported by the rule at common law, citing a few English cases, the earliest of which was in 1754, as well as some American cases which followed that rule. It is stated the general theory of cases accepting this view is that as a will is ambulatory until death, a will which is itself revoked can have no effect as a revoking instrument.
The doctrine that the earlier will is revived unless an intention to the contrary appears, proceeds on the theory that the destruction or revocation of a will which revoked or superseded a previous one, leaves the first as if the second had not existed, unless it be clearly proved that the second was destroyed with the intention of dying intestate. This, in theory, is similar to the view just discussed  in other words, because neither is a complete will until the death of the testator.
The view that the destruction or revocation of a subsequent will does not revive a prior will, but that such prior will can only be revived by a republication, is clearly illustrated in Lively v. Harwell, 1850, 29 Ga. 509, 515, 516, quoted with approval on a subsequent appeal in Harwell v. Lively, 30 Ga. 315, 320, 321, 76 Am.Dec. 649, 651, where the court said:
"Here are two wills of different dates and inconsistent provisions, and the last one, in point *410 of date, is confessedly revoked. Which of these papers, or does either, show the final testamentary mind of the testator? I say neither does. The last one does not, as is admitted by everybody, for it is expressly revoked. How is it with the first? That contains what was once his mind, but we know that he changed that mind when he made the last one. How do we know that he ever reverted to it? It is said that he changed again when he revoked the last. This is true, but to what did he change? The case is this: he had a scheme and abandoned it for another, and then abandoned the second. All so far is clear and satisfactory, but can you go further and say that, when he abandoned the last, he returned to the first? If these two schemes comprehended ALL the possible dispositions of his property, then the conclusion would be a logical one, that when he abandoned the one he returned to the other. But when the number of possible schemes in every case is legion, you can not say that because he has departed from any one, you know his mind has settled upon any other particular one out of that infinite number. The whole fallacy lies in assuming that the two papers exhaust the subject. It seems to me that the abandonment of any one scheme does not of itself afford the least indication in favor of any other particular one out of an infinite number. * * *" (Emphasis is that of the Georgia court.)
It may be that in the instant case the failure of the testator to destroy the 1949 will should be considered as bearing upon the testator's intention to revive it, if, in fact, he had destroyed the 1952 will. However, the only thing approaching evidence of any such destruction of the 1952 will is found in the testimony of Bertie M. Stringer. This was to the effect that she saw the deceased tear up some instrument. But, the destroyed instrument was not shown to be the 1952 will, so this testimony can hardly be regarded as sufficient *411 to raise a presumption that the 1952 will was in fact destroyed by the testator with the purpose of reestablishing or reviving his 1949 will.
Courts which have accepted the theory that an earlier will is not revived unless an intention to revive appears seem content to merely say the better opinion seems to be that in the absence of statute, the subsequent destruction of the revoking will does not have the effect of reviving the former will unless there is evidence that it was the intention of the testator to revive the former will. Where there is an express revoking clause, it is said that this is especially true.
The position taken by certain English courts and the courts of at least three of our states, that the question of revival is one of pure intention without there being any presumption either for or against revival arising by virtue of the destruction of the revocatory will, is of little help to us here as no such intention appears from the record.
We have no statute providing that a will revoked by a subsequent will is revived by the destruction of the subsequent will when the former will has not been destroyed. We do have § 6-306, W.C.S. 1945, previously mentioned, expressly providing the different ways by which a will may be revoked. The legislative silence relative to the question of revival does not incline us to believe a presumption is created that a will revoked in one or the other of the ways authorized by express statute, is brought back into life. If any presumption at all is indicated, it seems more reasonable to us that it should be that the presence in our laws of an express statute prescribing ways in which a will may be revoked, without there being a further statute *412 providing for revival of such a revoked will, manifests that the legislature has intentionally spoken its last word concerning the existence of such a revoked testament.
We, therefore, conclude that the 1949 will of the deceased Charles L. Stringer was revoked by the 1952 will which contained an express revocation of all former wills, and that the 1949 will has not been revived. Nevertheless, as previously stated, the 1949 will still remains as evidence of a contractual obligation assumed by the deceased Charles L. Stringer, and it was beyond his power to escape that commitment by exercising his undoubted right to revoke the 1949 will as his last will and testament. As to whether or not there was a revocation of the 1949 will, independent of the 1952 revocation, occurring by virtue of the 1954 instrument, will receive our attention in our discussion of the validity and subsistence of the 1954 document as the last will and testament of the deceased at the time of his death.
The contention of the appellee that the instrument was not the last will and testament of the deceased because the 1954 instrument offered was imprinted by the use of carbon paper is entirely without merit. There is no special virtue in typing made by imprint through a ribbon rather than through a piece of carbon paper. The typing was all done at the same time and in a single operation. The important thing is to discover whether the typewritten instrument offered was adopted by the testator as his last will and testament by the affixing to it of his signature and his having two witnesses to that signature affix their own signatures thereon.
*413 No one questions the signatures of the witnesses, but appellant claimed that the other signature purporting to be that of the deceased on the instrument was not his signature, and the trial court found it was not identical with the signature on the 1949 will, and that appellant had failed in her burden to prove it was the signature of the deceased. When we closely examine the transcript of the evidence, we find that a reputable banker of the community testified without equivocation that he knew the signature of the deceased and he positively identified the signature upon the offered instrument as being that of the testator. Similarly, the lawyer, who had represented the deceased during his lifetime, testified positively that he too knew the signature of the deceased and that the signature appearing on the instrument was that of the deceased. No attack of any kind was made upon the credibility of either of these witnesses, nor was any showing made of their lack of qualification. No witness appeared and testified in contradiction to the positive statements of these two disinterested witnesses. We do not overlook that the brother of the deceased, who was an interested witness, inasmuch as he stood to receive distribution of a portion of the estate of the deceased under the terms of the 1949 will, testified concerning the signature appearing upon the 1954 instrument. His testimony, however, was not positive, but when asked if the questioned signature was that of the deceased testator replied, "Well, I don't think it's his." On cross-examination, this witness' attempt to justify his doubt about the signature was anything but convincing. In fact, his effort to explain his doubt by giving as his reason the difference in the form of certain letters from the form in which he said the deceased usually wrote them, was in itself contradictory. At no time did he state directly and positively that it was *414 not the signature of his deceased brother. Under these circumstances we cannot say the evidence of this brother was sufficiently substantial to present that conflict in evidence which requires us to accept the court's finding that the signature of the deceased on the 1954 instrument had not been sufficiently established.
The circumstances surrounding the execution of the 1954 instrument all fortify this conclusion. The uncontradicted testimony is that the deceased and his widow went to the office of their attorney for the express purpose of making their wills; that they informed the lawyer of their wishes and he prepared wills which he thought carried out the instructions given him; that thereafter the deceased and his widow returned to the office of that attorney and the deceased called attention to certain changes which he desired to have made; that thereafter the attorney made the desired changes, but when the deceased and his widow returned a second time to execute their wills, the lawyer was not there, and the secretary in that office gave the deceased and his widow the reformed and completed instruments.
The further uncontradicted evidence shows that thereupon the deceased and his widow drove some 40 miles to the ranch home of the friends, who signed the questioned document as witnesses; that upon arrival the deceased stated to those friends that he and his wife were there to execute their wills and to get their friends to assist them by witnessing their wills; that then they all sat around a common table with the instruments the deceased and his wife had brought from the lawyer's office on that table before them and they proceeded to affix their signatures; that in doing this the ribbon-typed copy of the document  the carbon-typed *415 copy of which was presented for probate  was left unsigned by the deceased. But the carbon-typed instrument was executed by deceased and witnessed by their two friends. The offered instrument, thus executed and witnessed, was not a copy. It was an original. Hence, this is not a case where there was executed an original will, as well as a copy of that original, and the authorities offered to the effect that in such a case all executed copies must be produced or accounted for are inapplicable. It is inconceivable that a person who had gone to his attorney, directed the manner in which his will was to be prepared, corrected the first draft, secured the final draft, drove 40 miles in order to get his friends to witness the instrument he had had prepared by his lawyer, and informed his friends the purpose for his visit there, should have changed his mind and not executed the document to be his last will and testament, without some person then present knowing about the change of purpose and so testifying to that effect at the hearing. The whole affair corroborates the verity of the signature upon the offered instrument.
In considering the trial court's findings and its judgment refusing to admit the 1954 instrument to probate as the last will and testament of the deceased, it is, of course, important that we keep in mind the firmly entrenched rule of this court, that in the face of a finding of fact by the lower court, we will not substitute our judgment for that of the trial court when there is conflict in substantial evidence regarding that fact. And we are mindful that in the face of conflicting evidence that we must regard only the evidence most favorable to the successful party, together with all fair inferences which may reasonably be given it.
*416 However, where there is no substantial evidence that gives rise to a conflict, we have the right and in fact the duty to examine the record and reach our own independent conclusion from the substantial evidence therein contained.
In 5 C.J.S. Appeal & Error § 1564(6), p. 1288, it is said:
"Where there is no substantial conflict in the evidence it has been held that the presumption in favor of the trial court's conclusion does not apply, * * *."
And in 3 Am.Jur., Appeal and Error, § 954, p. 518, it is said:
"* * * However, the presumption in favor of judicially found facts does not exist where such findings are the result of misconception of law, or when there is no conflict in the evidence, * * *."
We cannot say that there is a wealth of authority in the form of decisions respecting this seeming exception to the general rule regarding findings of fact made by a trial court, but this does not detract from the soundness of the exception. Perhaps one of the clearest statements made by a court in applying the exception to the general rule is to be found in Stevenson v. Sherman, Tex. Civ.App., 231 S.W.2d 506, 512, where it was said:
"* * * The items derive from testimony which we regard as undisputed; hence whether or not they constitute a necessary expense will be without reference to the trial court's conclusions, since the presumption in favor of a finding of fact on disputed testimony does not attach to a conclusion drawn from undisputed evidence. Funk v. Walker, *417 Tex.Civ.App., 241 S.W. 720; Gulf, C. & S.F. Ry. Co. v. Gaddis, Tex. Com.App., 208 S.W. 895. * * *"
An earlier case from Alabama, Barnes v. Clark, 227 Ala. 651, 151 So. 586, 588, 90 A.L.R. 637, 641, states the matter as follows:
"In reaching this conclusion we have not lost sight of the rule obtaining here that a presumption should be indulged in favor of the correctness of the conclusion of the trial judge, who sees and hears the witnesses, when there is conflict in the evidence, but in this case there is no conflict, and therefore nothing upon which to base this general presumption. Wright v. Price, 226 Ala. 591, 147 So. 886."
The Alabama courts have been consistent in following the rule in the Barnes case, supra. See Haden v. Boykin, 259 Ala. 504, 66 So.2d 708; Liberty Nat. Life Ins. Co. v. Trammell, 33 Ala.App. 275, 33 So.2d 479, certiorari denied 250 Ala. 159, 33 So.2d 483; Id., 35 Ala.App. 300, 51 So.2d 167, reversed 255 Ala. 1, 51 So.2d 174, certiorari denied 255 Ala. 236, 51 So.2d 176; Department of Industrial Relations v. Savage, 38 Ala. App. 277, 82 So.2d 435.
But we need not go so far afield, because this court in Washakie Livestock Loan Co. v. Meigh, 47 Wyo. 161, 33 P.2d 922; 50 Wyo. 480, 491, 492, 62 P.2d 523, 526, 107 A.L.R. 1063, in reversing the finding and judgment of the trial court, considered the evidence which was available to that court in making its decision, and in doing so said:
"It is urged that this evidence establishes a contract of bailment of the sheep in question entered into during the spring of 1931, between Meigh on *418 the one hand and the lien claimants on the other. We are utterly unable to see that this is so. We think the only fair inference that can reasonably be drawn from this record is that these men who were working with the sheep were at all times merely employees of Meigh and the Meigh Livestock Company, and that the sheep were always after the spring of 1931, as they had been before that time, under the control and in the possession of Bob Meigh. In saying this we do not overlook the general finding of the trial court in favor of the lien claimants. We are constrained to say that, in view of the statements made by Meigh in the mortgage he signed and his sworn property statement quoted from above, no weight can be attached to his testimony that there was an oral contract of bailment entered into between him and the men who looked after the sheep. The testimony of Gomez, the only one of those who were the other alleged contracting parties to appear on the witness stand, falls far short of establishing such a contract. He unequivocally said that he was an employee of Bob Meigh, and his statement is borne out when the record is viewed in its entirety. In our judgment, the general finding of the district court is not supported by the evidence in the case if such finding should be construed as determining that there was such a contract."
The parallel between the position taken by Judge Riner in the Washakie Livestock Loan Company case, supra, and the instant case seems clear to us. In the former case, the court had before it the testimony of both Meigh and Gomez in conflict with other testimony given to the contrary. Yet, when from an examination of the entire record, it became obvious to the reviewing court that the positive testimony of those witnesses was of doubtful character because of other evidence in the record, such testimony was said to be without weight. This simply meant that because of its doubtful quality, the court did not consider it presented *419 a conflict in the evidence which justified accepting the lower court's finding. This court, therefore, refused to follow the general rule and uphold the lower court's decision, although on its face there appeared to be a conflict in evidence. This resulted because the court considered the evidence purporting to raise such a conflict as unsubstantial.
Another earlier Wyoming case, Carter Oil Co. v. Pacific Wyoming Oil Co., 37 Wyo. 448, 467, 263 P. 960, 966; 38 Wyo. 361, 267 P. 85, at least touched upon the question where it is said:
"* * * That testimony is all to the effect that the lands of homesteaders in this case are all on the same geologic structure with other lands, on part of which producing oil wells are located. If that is true, and we must accept it as true for the purposes of this decision, the defendant never had an opportunity to get more than one lease thereon. * * *" (Emphasis supplied.)
The point in the Carter case was that if the only testimony in the record was to the same effect, this court must accept it as true. So in the case now before us, if as we do, we disregard as unsubstantial the testimony given by the brother of the deceased when he said he did not think it was his brother's signature, the only other testimony is that of the banker and the lawyer, and it must be accepted as true by us. We must conclude, therefore, that the court erred in ignoring the only substantial evidence given which bore on the authenticity of the deceased's signature, and we find that the disputed signature on the 1954 instrument was proved to be the signature of the deceased. No one questions the authenticity of the signatures of those who signed as witnesses and those witnesses *420 themselves appeared and testified to their own signatures. The fact that they were unable to recall the details concerning the signing of the offered document is of no probative value respecting the verity of the deceased's signature. The following reasoning and logic of a relatively old California case, In re Tyler's Estate, 5 Cal. Unrep.Cas. 851, 50 P. 927; 121 Cal. 405, 53 P. 928, 929, 930, is applicable here and is quite persuasive and warrants its quotation here:
"* * * While the Code provides that certain things are necessary to the making of a valid will, it does not prescribe how those things shall be proved. It leaves that to the general rules of evidence. There is provision, it is true, that if the attesting witnesses are alive, and present in the county, they must, in the event of a contest, be called. This is a very natural and just provision, for in such case the failure of the proponent of a will to call his attesting witnesses would be a very suspicious circumstance. But there is no statutory declaration, and no principle of law, to the effect that a will executed in due form shall go for naught unless an attesting witness, after the lapse of many years, shall continue to recollect everything material that occurred at the time he subscribed his name to it. Such a rule would make the validity of the will dependent, not upon the disposing mind of the testator, nor his freedom from duress, undue influence, or fraud, nor upon his clear expression of his intention in the body of the instrument, nor upon its execution in conformity to the form and ceremony prescribed by the statute, but upon the fullness, accuracy, and persistency of the recollection of one of the persons who signed it as a witness. Such a rule cannot be maintained either upon principle or precedent. What constitutes a sufficient execution of a will is prescribed by statute. What constitutes sufficient proof of such execution is not so prescribed, and is a different question,  a question *421 to be solved by the general principles of evidence. * * * Where an attesting witness has no recollection as to certain matters connected with the making of the will, the case is, upon principle, in the same condition as where he is dead, insane, or absent; * * *.
"Authorities supporting the above conclusion are numerous. We will refer to some of them: In 1 Greenl. Ev. par. 38a, we find the following: `Execution of Instruments  Regularity of Acts. Of a similar character is the presumption in favor of the due execution of solemn instruments. Thus, if the subscribing witnesses to a will are dead, or if, being present, they are forgetful of all the facts, or of any fact material to its due execution, the law will in such cases supply the defect of proof by presuming that the requisites of the statute were duly observed.' Authorities are cited sustaining the text. In Beach on the Law of Wills the author, in paragraph 39, says: `On the death of the witnesses, or on the failure of their memory, the proof of the fact of execution begets the presumption that all the details of the statutory requirements were complied with, whether so stated in the attestation clause or not, unless the contrary be proven.' In 1 Jones, Ev. § 44, it is said as follows: `If a will purports to have been duly signed, attested, and witnessed, on proof of execution the court will presume, in the case of the death of the witnesses, or in case they do not remember the facts connected with its execution, that the law was complied with; and the details of the statutory requirements will be presumed, whether it is so stated in the attestation clause or not, unless the contrary is proven.' * * *
"* * * In Burgoyne v. Showler [1 Rob.Ecc. 10] it is said: `I think I should be establishing a very dangerous precedent if I were to pronounce against this will. I think the principle on which Sir H.J. Fust has acted in these cases is this: That, in the absence of the recollection of the witnesses, *422 he will presume the will to be duly executed.' In Re Leach [12 Jur. 381] each of the witnesses `remembered that he signed his name as a witness to the will in the testator's presence, but neither of them could recollect whether the testator signed his name in their presence, nor whether his signature was already set to the will when they signed, or whether the other witness was present'; and upon this testimony it was held that `the presumption is in favor of the due execution, according to the principle laid down by the learned judge who sat for me in the case of Burgoyne v. Showler, and I therefore decree probate to pass as prayed.' In Kirk v. Carr [54 Pa. 285] the court says: `Want of memory will no more destroy the attestation than insanity, absence, or death.' In Clarke v. Dunnavant [10 Leigh 13], Tucker, J., in his concurring opinion, says, having alluded to a case where the attesting witness to a will had sworn affirmatively that the statute had not been complied with in making it: `How is it where, as in this case, they do not negative a compliance with the statute, but merely have forgotten the circumstances? It seems to me that, upon fair analogy, the question should be decided as it would be if the witness were dead, and his handwriting proved. And so, accordingly, I think, are the authorities to be understood.' After referring to the case of Jackson v. Le Grange, 19 Johns. 386, approvingly, he says: `Where the memory of the witness fails, the proof of his signature will justify an inference that all the requisites of the law have been complied with.' Further on he says: `From the whole of these cases, then, I deduce that on a question of probate the defect of memory of the witnesses will not be permitted to defeat the will, but that the court may, from circumstances, presume that the requisitions of the statute have been observed, and that they ought so to presume from the fact of attestation, unless the inferences from the fact are rebutted by satisfactory evidence.' Having alluded to suggestions of mischief which might follow the decision, he *423 says: `Far greater mischiefs would arise from a contrary decision, which should make the rights of every devisee and legatee depend, not only upon the honesty, but also upon the slippery memory of witnesses. Under such a decision no man could be sure of dying testate, since the forgetfulness of a witness would frustrate all his precaution; and a question of title by will, which, in the spirit of the statute of frauds, the legislature designed to rest upon written evidence alone, would, after all, depend upon the integrity and the memory of those who were called on to attest the instrument. The consequence would be that I may have a good will by me to-day, but, if I live five years, it may become a void instrument, because one of the witnesses to it cannot recall some ceremony of its execution. Such a consequence I would not aid in bringing about. It would tend, I have no doubt, to multiply the attempts, already too common, to set aside wills, since the chances of success must be very much increased if the frailty of human memory is to be called in to the aid of the discontented heir.' In the leading opinion by Parker, J., the same views are expressed, and he says: `Few persons witnessing a paper would, after eight or nine years, be able to recall every fact that might be necessary to give it legal validity; and if their defect of memory is, without other impeachment, to prejudice the rights of parties claiming under it, the mischief would be greater than any that can result from this decision.' * * *"
In consequence, we hold that the 1954 instrument was executed with all the formality required by our statute § 6-304, W.C.S. 1945:
"All wills to be valid must be in writing, or type-written, witnessed by two (2) competent witnesses, and signed by the testator or by some person in his presence and by his express direction, * * *."
*424 It was signed by the testator and witnessed by two witnesses at his request. That was sufficient.
We also hold the 1954 instrument, improperly referred to in these proceedings as a carbon copy, but in fact an original instrument which bore the signature of the testator and the signatures of two subscribing witnesses, must be admitted to probate as the last will and testament of the deceased.
Inasmuch as the 1954 instrument also contained an express clause revoking all previous wills and we now find that the 1954 instrument was the last will and testament of the deceased, there is now left no question but that the 1949 will of the deceased was revoked.
What we have previously said with respect to the 1949 instrument remaining as evidence of the contract between the deceased and his first wife, Emily K. Stringer, does not mean that the property of the deceased should be distributed in accordance with the provisions of the 1949 instrument because that will is now revoked. It does, however, mean that the deceased's obligations under the contract evidenced by the 1949 instrument must be discharged and satisfied during the administration of the deceased's estate, and that the portion of that estate which would have passed to the family of the deceased's first wife, Emily K. Stringer, must be set over to them in fulfillment of the deceased's contractual obligation. Not until then will the portion of the estate of the deceased remaining after the satisfaction of the contractual obligation be subject to disposition under the terms of the 1954 last will and testament of the deceased.
*425 It is, therefore, ordered that the judgment of the trial court be reversed; that the judgment and order admitting the 1949 instrument to probate as the last will and testament of the deceased be vacated, set aside and held for naught; that the court enter its judgment admitting the 1954 instrument to probate as the last will and testament of the deceased; that the contractual obligations assumed by the testator under and by virtue of the terms of the 1949 mutual and reciprocal wills be fulfilled by setting over unto the parties named in the 1949 mutual will of the deceased such properties as are therein specified and which remained in the possession and ownership of the deceased at the date of his death; and that the district court make such other and further order as may be necessary to carry into full effect the conclusions reached in this opinion.
Reversed with directions.