In the Matter of the ESTATE of Julia
Freeman CAREY.

Robert D. CAREY, Appellant
(Contestant below),

v.

Franklin SMITH, Appellee (Executor).

No. 4124.

Supreme Court of Wyoming.

Dec. 22, 1972.

John J. Rooney, Cheyenne, for appellant.

John W. Pattno, Cheyenne, for appellee.

Before McINTYRE, C. J., and PARKER, McEWAN and GUTHRIE, JJ.

Mr. Justice GUTHRIE delivered the opinion of the court.

Franklin J. Smith, who was designated as executor therein, filed a petition for probate of an instrument purported to be the last will and testament of Julia Freeman Carey, which was dated February 27, 1971. Robert Davis Carey, the grandson of deceased, filed a contest of said will, setting out three grounds: That decedent was incompetent to make a will; that Genevieve B. Carey exercised undue influence over the testatrix and procured a devise and legacy for herself; and that the said will was not properly executed and attested.

Upon the trial thereof the trial court directed a verdict for proponent and ordered the will admitted to probate. It is from that judgment the contestant, Robert Davis Carey, appeals.

Because Genevieve B. Carey is almost always in the testimony and in portions of the brief so referred to, she will hereinafter be referred to as "Jena."

Contestant's case was presented by three witnesses and the recall of the proponent herein as an adverse witness. A summary statement of this testimony, as received and as appears in the record, so far as it is material is as follows:

Robert Davis Carey is the grandson and only direct heir of the deceased. He had visited her four to five times a year up until the time of her death. She had resided in a private residence for at least ten years and the last four to five years had kept a housekeeper who lived in. She had broken her hip in 1968 and thereafter it was hard for her to get around by herself although she had no other specific illness. She was 88 years old when she died and he had advised her for years on major business decisions. He had discussed her will with her when she inquired as to the propriety of designating Mr. Horiskey as her executor if he, contestant, predeceased her. She wanted Jena to have the income from her estate during her lifetime if he predeceased her. The last conversation on this point was November 12, 1970. She mentioned in August 1971 she had left one-half of her property to Jena. At that time he asked her about her will and if Mr. Horiskey was still her lawyer. She told him he was no longer her lawyer and could not really say where her will was. She was confused and did not know at that time who her lawyer was, nor did she know the lawyer who had drawn the will. He asked and received permission to talk to Mr. Horiskey about her will. Mr. Horiskey told Mr. Carey that testatrix had called in November 1970 and wanted to revise her will and he had drawn one for her dated and executed November 16, 1970. Horiskey had returned this will to her when she told him she was going to have another one prepared. Mr. Carey learned from this conversation that he should make inquiry of Mr. Smith, who advised him he had drawn a will which was executed and currently in effect. Smith told him this will changed the trust arrangement whereby he and Jena were each to receive one-half the income and that all references to a trust arrangement had been deleted.

From his observation there had been a gradual deterioration of testatrix's memory over the last several years. She would repeat the same story perhaps one-half hour later. She had been a competent gin rummy player until the last two years before her death but she no longer played a respectable game. The last year of her life she was vague regarding her cash and securities and the amount of money in her savings accounts. She had made inquiry a

couple of times about some American Motors stock which she had at one time owned and could not recall if she had sold it or its status. He had seen her on February 20, 1971, a week before she signed this will. She had on several occasions mentioned items she wanted him to have and to stay in his family. She felt strongly about heritage of the family. She had related to him Jena was essentially a friend; that she didn't have a deep, warm relationship with her, and didn't want to leave her any more than a modest amount. Jena had run various errands and written checks for her and helped to arrange for housekeepers and nurses. About three years before and on several later occasions they had visited about having an attorney in fact for her. Jena criticized his business ability and judgment and she was bitter toward him. He had consulted with Dr. Flett several times in the last four to five years about decedent's condition and had attempted to relieve her from carrying on financial and personal transactions. He discussed setting up a guardianship with Smith in the fall of 1971 and he had talked to her last about her property, its nature, and extent on November 12, 1970. At the time they were talking about a change in her will. She did not have knowledge of the nature and extent of her property, although he testified she had some knowledge thereof. Subsequently they may have talked about some aspect of her property. They had discussed the property she owned near Douglas and had discussed the lots she owned in Cheyenne. She recalled these generally but not the number—neither could the witness remember the specific number.

Smith, proponent, being called as a witness for contestant, testified he had gotten in touch with contestant about the testatrix's condition and had talked to him Labor Day weekend. As a result of these conversations and after consulting relatives, her doctor, and friends, the guardianship proceeding was filed because her physical condition required she be hospitalized. Her mind was alert but would some-

times falter. She would carry on a conversation and make sense, although she repeated stories, but her physical condition was not good. She was not able to properly manage and take care of herself and her property, being physically but not mentally incompetent. Between the last of August and the middle of September he made one trip to the hospital. This was the first time he had ever seen her when she was not well groomed. In connection therewith he procured statements from Drs. Flett and Bindschadler, which appear in the guardianship file. The appointment was made on October 2 or 3, 1971.

Mrs. Foltz had known testatrix for 30 years and had done housework for her at intervals until her death. Testatrix had talked to her about her will, and three to four months prior to her death had told her the will was simple—she had left everything to contestant. Her personal property was to go to contestant and continue in the family.

Mr. Horiskey, a lawyer, had known testatrix casually for 15 to 20 years. She probably didn't know who he was until 1968 when he did some legal work for her. In October 1970 he received the 1958 will and 1962 codicil from Mrs. Hickey along with the key to testatrix's safety deposit box. He called testatrix and told her he would like to deliver these to her, which he did. He further told her that she should make a change in her will or codicil because of the death of Judge Hickey. He went to see her on November 6, 1970, after a call from Jena on the fifth advising him Mrs. Carey wanted to make a change in the will. She handed him the will upon which she had made certain marks and notations. They talked about changes. At this meeting, in addition to other changes, she suggested that Jena be designated as executrix in the event contestant predeceased her. Jena did not want to act as executrix and only agreed hesitantly. As the talks progressed it developed she wanted to make specific bequests even if contestant did not predecease her. He drew a rough draft, giving it to her. At that

point she only wanted Jena to have a silver picture, desk, and her home. After this was done she decided she wanted to make certain bequests to some nurses and Mrs. Foltz. Another proposed draft was prepared, including specific bequests and providing that Robert Davis Carey receive everything else if he survived her. At that time she indicated if her grandson did not survive her she wanted Jena to have the income from the property as long as she lived. There was a discussion as to the disposal of the corpus upon Jena's death and testatrix designated St. Joseph's Orphanage. Mr. Horiskey suggested she talk to contestant about this and solicit his suggestion as to a residuary legatee. She told him at that time she did not want it to go to Jena as she did not want the property to go to Jena's family. On November 12, 1970, he was called by contestant, who told him his grandmother had called him, and Horiskey advised him he was to see the testatrix the next day. When he arrived on November 13 Mrs. Carey had taken the rough draft and put at the top "To Jena one-half of the income," and "To Robert D. Carey one-half of the income." She had made other changes, including striking contestant's name as executor, and inserting the name of Mr. Horiskey. He had explained to her earlier that if she desired to leave one-half the income to each, contestant and Jena, that a trust must necessarily be set up and the trustee named. She expressed displeasure with trusts and banks because of the difficulty she had previously had with a trustee and indicated this had started problems which had continued, but he told her this was necessary. She desired that he act as trustee and the will was drawn in that form and was executed on November 16, 1970. Jena was present at several of the conferences.

This will was much different from the 1958 will and codicil in that it included several specific bequests, placing the remainder in trust with one-half the income to go to contestant and one-half to Jena until her death, and then the whole corpus was to go to contestant if he survived.

On February 8, 1971, she advised him she was not happy with the designation of the orphanage as the beneficiary after the trust terminated, although she had still not determined a substitute. She wanted to change some of the specific bequests and wanted to change the provision providing that if contestant and Jena could not agree on the successor trustee that the district court was to name one in 15 days; she desired that be changed to 30 days. On February 16 Jena called him and advised him Mrs. Carey wanted to change lawyers and her will and to pick up her papers. On February 23 Jena came to his office and Mrs. Carey remained in the car. He went down to see her and asked her if she wished to talk to him. She advised him she did not and wanted her papers. He delivered the key and will to her. He heard nothing more of this until August 1971 when contestant came in and inquired what had happened, and said that Mrs. Carey had sent him down to ask about her will.

The former wills were received in evidence. The 1958 will and codicil executed by testatrix left her entire estate to the contestant herein with the provision that if he predeceased her the entire estate was to go to Yale University for creation of a scholarship fund, and provided for contestant to act as executor. The 1962 codicil provided that if contestant predeceased her, specific legacies of personal property were made, with her home to be left to Jena, and J. J. Hickey was designated as executor in the event of the death of her grandson. The will drawn on November 16, 1970, bequeathed to Jena her home and certain personal items, and specific bequests were made therein not conditioned upon the death of Robert D. Carey. The remainder of the estate was to be vested in a trustee with one-half the income to be paid each to contestant and Jena, providing that in the event of Jena's death the trust should terminate and all the assets should pass to contestant, and if contestant predeceased Jena and did not leave a wife or heirs she was to receive the income as long

as she lived and upon her death the residuary should be paid to St. Joseph's Orphanage.

The 1971 will offered for probate, after certain bequests, including the home of the deceased to Jena and bequests to other specific persons, left the remainder of the estate to Robert Davis Carey and Genevieve B. Carey in equal shares with no trust intervention.

█ Contestant's contentions may be summarized in this manner: That there was sufficient evidence to go to the jury as to testatrix's incompetency; that there was sufficient evidence to submit to the jury on the question of undue influence; and that there was a question of fact for submission to the jury whether the will was properly witnessed and executed. He further raises questions of the admissibility of certain excluded evidence. Although contestant strongly urges that the evidence received made a submissible case on the issues, he also urges that in the event the court found this not to be true that the evidence which was improperly excluded and which should have been received would so strengthen his showing that the case should have been submitted. The items of excluded evidence will be considered along with the effect thereof separately and later in this opinion.

There is no reason to repeat the rules which govern our disposal of appeals involving directed verdicts,[1] nor the proponent's burden of proof.[2]

It is seldom that a factual situation so parallel can be discovered in a preceding case. However, there is compelling demonstrable similarity to the case of In re Morton's Estate, Wyo., 428 P.2d 725. Both involved aged people, Morton being 85 and Mrs. Carey being 88. Both were in poor physical condition from aging, although in addition Morton had diabetes

and arteriosclerosis. Both were forgetful. Mrs. Carey had apparently become confused about some American Motors stock; Morton was mistaken about business property he had sold. Morton was unclean and slovenly about his appearance, unlike testatrix. Morton was not as alert as in the past and would repeat stories. There is no testimony testatrix here was not alert. She did repeat stories—a not uncommon human failing—and her game of gin rummy had deteriorated, but so had Morton's checker game. There was a real showing Morton was contrary and belligerent on occasions and suspicious. We find little showing of this in the instant case. Morton had some trouble with small money matters and so had Mrs. Carey. The Morton guardianship was created some six months after the drawing of the will on a showing that Morton was " 'writing checks in large amounts to everybody and was unable to take care of the small amount of business he has, to receive rents, and pay bills,' " 428 P.2d at 733. There is no evidence or suggestion even of Mrs. Carey engaging in such activity. There was a much stronger showing made of the incompetency of Morton than has been made in this case, and we in that case held the contestants had not satisfied their burden of proof as to incompetency and that it was not error to direct a verdict on that phase. There is little point in extending this opinion further by citation or discussion in light of Morton.

## ADMISSIBILITY AND EFFECT OF OFFERED AND EXCLUDED TESTIMONY

Because contestant asserts that if the record were not sufficient to take this case to the jury that certain testimony which was excluded and should have been received would have satisfied that requirement and made a submissible case, the ad-

---

1. Western Transmission Corporation v. Colorado Mainline, Inc., 10 Cir., 376 F.2d 470, 473; Holstedt v. Neighbors, Wyo., 377 P.2d 181; In re Draper's Estate, Wyo., 374 P.2d 425, 427.

2. Wood v. Wood, 25 Wyo. 26, 164 P. 844, 847; In re Merrill's Estate, 80 Wyo. 276, 341 P.2d 506, 507.

missibility and effect of this testimony will next be considered.

Contestant complains that the trial court refused to receive evidence regarding mental condition unless it related to the exact time of executing the will, that no evidence of her capacity was admissible unless the witness was an expert, and that the testimony of a witness to a will is not subject to impeachment.

Heavy reliance is made upon the case of In re Faragher's Estate, Wyo., 367 P.2d 972. Contestant contends the court was in error in assigning as grounds for refusal to receive testimony regarding mental condition unless it related to the exact time of executing the will. It is to be observed there is much evidence in the record of her acts and activities, both prior to and after the execution of the will. The trial court, however, would not admit or receive proffered evidence of opinions as to her condition at other times. We believe Faragher inapplicable for at least two reasons. First, the court noted that it was discretionary with the trial judge, and second, there was in that case a showing of a permanent continuing condition or disease.

The effect and purpose of such evidence as to the testator's actual mental condition both before and after the execution of the will is succinctly set out and placed in proper perspective in a California case, being In re Dupont's Estate, 60 Cal.App.2d 276, 140 P.2d 866, 871, where it was said:

" * * * It is axiomatic that the critical inquiry in determining the mental capacity of a person to execute a will is directed to his condition of mind at the very time of its signing. Evidence of his previous conduct is only admissible for the light that it may throw on his condition of mind at that precise moment. * * *"

Inasmuch as all the excluded items of evidence go to the question of competency or testamentary capacity, excepting only the proffered impeaching testimony of Horiskey, these will be discussed next. It is contended that the trial court committed error when it refused to allow Robert D. Carey to express an opinion as to whether or not testatrix knew the nature and extent of her property. He bases this upon two grounds. First, that this witness had qualified as an "expert" because of his close association with his grandmother. No citations are noted that any such relationship and close association confer the status of "expert" upon such a witness. This contention need not be further considered, DeLuna v. State, Wyo., 501 P.2d 1021, 1025; Alcala v. State, Wyo., 487 P.2d 448, 456, certiorari denied 405 U. S. 997, 92 S.Ct. 1259, 31 L.Ed.2d 466, rehearing denied 406 U.S. 911, 92 S.Ct. 1613, 31 L.Ed.2d 823. It is to be observed, however, that the logical result of such a rule would be far-reaching with much possibility of mischief. Will contests, involving as they usually do accompanying family relations and close association, would certainly proliferate all will-contest proceedings with "experts." Second, he contends that this evidence should have been received because laymen are competent witnesses to testify to mental capacity when they relate facts on which their opinions are based, citing In re Johnston's Estate, 63 Wyo. 332, 181 P.2d 611. However, in the later case of In re Merrill's Estate, supra, 341 P.2d at 508, there has been expressed a clear caveat sharply restricting what contestant contends was the holding in the Johnston case, when the following expression was made:

" * * * We think the voicing of opinion as to testamentary capacity by a person who is not especially trained tends to invade the province of the jury and should not be permitted. * * *"

This opinion further calls attention to the fact that even where such opinions are accepted that this has been rested upon the reasons for the opinions. There is, however, a much more compelling reason why this testimony was not admissible. In connection with both of the witnesses, Carey and Horiskey, these questions were directed at testamentary capacity. This was an ultimate fact or issue for determination by the jury. We have heretofore held it is

improper for either an expert or non-expert to give an opinion upon an ultimate issue in a case, State ex rel. Kirk v. Gail, Wyo., 373 P.2d 955, 957; Macy v. Billings, 74 Wyo. 404, 289 P.2d 422, 424; Taylor v. MacDonald, Wyo., 409 P.2d 762, 764. However, insofar as expert testimony is concerned, this court in Krahn v. Pierce, Wyo., 485 P.2d 1021, 1025–1026, has indicated a possible exception. The first question directed to Mr. Horiskey was "Did you form an opinion at that time [February 8, 1971] as to her testamentary capacity?" Objection was made and sustained that this was invading the province of the jury. An offer of proof was made that he would have testified that she did not have such capacity, and further included that he would have testified she was not of sound and disposing mind and memory and did not have knowledge of the extent of her property, the value of it, and the natural objects of her bounty. This was made to cover both dates, February 8 and February 27, 1971. Objection was made to this on the ground of foundation. Witness Horiskey had testified to no facts upon which he could possibly have logically based this observation or opinion at either date. Johnston specifically mentions the necessity of having testified to facts or circumstances which would justify the expression of such opinion.

It is to be noted that the question propounded to witness Carey, which was excluded and to which objection was made, was as follows:

"I will repeat the question, do you have an opinion as to her ability to know the extent and nature of her property at that time [February 27, 1971]?"

After the objection was sustained an offer was made that if the witness were allowed to answer he would state it was his opinion she did not have this ability, and the offer of proof also contained suggestions of additional questions concerning testamentary capacity. The court sustained an objection to this offer with the statement that the witness would not be allowed to give con-

clusions nor could he state his opinion. It was further suggested it was an invasion of the province of the jury since Carey was not an expert. However, from what has been said before with reference to the Horiskey testimony it is our view this was not admissible. The basis of the court's excluding such evidence is of no importance if the evidence is inadmissible, Logan v. Pacific Intermountain Express Company, Wyo., 400 P.2d 488, 491; Lawson v. Schuchardt, Wyo., 363 P.2d 90, 93. This ruling was certainly consonant with Merrill. It is our view that the proffered testimony of Robert Davis Carey was properly refused.

Contestant further claims error because of the refusal of the court to admit the guardianship file in evidence. While in re Morton, supra, 428 P.2d at 733, suggests admissibility of such a file, it suggests further that when the basis of the proceeding is the care and management of the property that it is entitled to little or no weight. Again, as in Morton, testimony about this was allowed and received by the court over objection. The court had another tenable basis for refusing to receive this file because it contained letters of Drs. Bindschadler and Flett. It was indicated in the ruling that the court would not allow the letters to establish the things mentioned therein and suggested that a witness be called. When such an exhibit is offered as a whole, but which contains inadmissible material, the court is under no obligation "to separate the wheat from the chaff," In re Morton, 428 P.2d at 732.

Contestant further complains of the refusal of the trial court to admit as a separate exhibit the letter from Dr. Flett discussing testatrix's condition, which appeared in this file. This was offered for two purposes: First, as to Mrs. Carey's mental condition over the three-year, two-year, one-year, and six-month periods prior to September 1971. Second, for impeachment, which will be mentioned later. The record shows Dr. Flett was present and available as a witness. The contestant's

pretrial memorandum had set him out as a witness but contestant offered this letter as evidence of a state of facts. The offer for the purpose of showing Mrs. Carey's mental condition obviously brings it under the stricture of the hearsay rule and it was properly excluded for that purpose. It follows that such evidence cannot be received to prove the truth of the matter asserted, VI Wigmore on Evidence, § 1766, p. 178 (3d Ed.). This court has observed in Jennings v. C. M. & W. Drilling Company, 77 Wyo. 69, 307 P.2d 122, 124:

"* * * A statement, written or otherwise, by a person not summoned as a witness and made subject to cross-examination is inadmissible as hearsay, except in certain cases which are exceptions to that rule, * * *"

No exception has been suggested in this case.

It would appear that the letter might have been received by way of impeachment but no detailed examination of that will be made because of what will follow.

■ Dr. Flett had earlier testified that he had said no woman could influence Mrs. Carey but that a man could. Horiskey was asked if Dr. Flett had made a statement about her susceptibility to influence. Objection was made and sustained thereto. Contestant's offer of proof was that the witness would testify Dr. Flett had said, "it would not be any trick to get —for anyone to get her—meaning Mrs. Julia Carey—to do something she really didn't want to do." He stated the purpose of this was impeachment. The reason no discussion is expressed thereon as to the propriety of both of these as impeaching evidence is the rule that had the trial court received both Flett's letter and Horiskey's testimony it would have in no manner improved contestant's position or helped sustain his burden of proof. Such inconsistent statements only affect the credibility of the witness, Cederburg v. Carter, Wyo., 448 P.2d 608, 610, and could not subserve the purpose of affirmative evidence, State v. Alexander, 36 Wyo. 390, 265 P. 76;

Crago v. State, 28 Wyo. 215, 202 P. 1099. It may be further observed that contestant raises no question of the prima facie showing by proponent.

From our view of the admissibility and effect of this proffered evidence which was excluded, there is no change in contestant's showing as to have justified submission of this case to the jury.

## UNDUE INFLUENCE

■ There is no evidence adduced that Jena B. Carey at any time or place engaged in any activity in connection with procuring a will in her favor. Contestant must necessarily have proven that she did exert such activity and did control the actions of the testatrix so that the will was really her instrument and not that of testatrix. In re Draper's Estate, Wyo., 374 P. 2d 425, 432. This was reiterated in the later case of In re Wilson's Estate, Wyo., 399 P.2d 1008, 1009, wherein it is said, citing Draper:

"* * * it is not sufficient to show that a party benefited by a will had the motive and the opportunity to exert undue influence; but there must be evidence *that he did exert it* and did so control the actions of the testator that the instrument is not really the will of the testator."

In re Draper's Estate also mentioned the necessity of clear proof of such activity and influence, 374 P.2d at 431.

## ATTESTATION OF THE WILL

■ The statutory provision which applies to the attestation of a will is as follows:

"All wills to be valid must be in writing, or typewritten, witnessed by two competent witnesses, * * *" Section 2–50, W.S.1957.

Dr. Flett testified that he was asked by Mrs. Carey to sign this instrument, although he did say he was merely asked to verify her signature and identify it, and this was his sole and only purpose. He had been heretofore told that this was Mrs.

Carey's will. We have said in referring to an attestation of a will:

"It was signed by the testator and witnessed by two witnesses at his request. That was sufficient." In re Stringer's Estate, 80 Wyo. 389, 343 P.2d 508, 522, rehearing denied and modified on other grounds 345 P.2d 786.

There was no conflict of testimony with reference to this and there could be no conflict of fact which a jury could resolve. To have submitted it to a jury would have been asking them to determine a question of law. The writer is confused by contestant's contention which he apparently bases on the fact Mrs. Carey did not personally tell Flett this was her last will and testament. Under a statute such as ours, which does not require publication in express terms, the great weight of authority is that publication is not necessary and the witnesses need not know that the instrument they are signing and attesting is a will, 2 Page on Wills, § 19.146, p. 274 (3d Ed.); 1 Schouler on Wills, Executors and Administrators, § 504, p. 579 (6th Ed.).

The judgment must therefore be affirmed.